THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LEE ROY GOREE, JR., Defendant-Appellant.

Fifth District   No. 81—592

Opinion filed April 20, 1983.

Randy E. Blue, of State Appellate Defender's Office, of Mt. Vernon, Patrick J. Hughes, Jr., of Springfield, and Donald L. Woods, of Southern Illinois University School of Law, for appellant.

John Baricevic, State's Attorney, of Belleville (Stephen E. Norris and Frank J. Bieszczat, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

The defendant, Lee Roy Goree, Jr., was convicted in the circuit court of St. Clair County of murder and was sentenced to 40 years' imprisonment. He appeals from his conviction and sentence, and argues that the trial court erred in failing to suppress a confession given by the defendant after he had been held in custody for three days without being charged with a crime or presented to a judicial officer. He also contends that the court relied on untrustworthy evidence introduced in aggravation at the sentencing hearing.

In the late afternoon or early evening of March 29, 1981, the defendant was arrested by Washington Park police officers. He was kept in custody and was not formally charged with a crime or presented to a judicial officer until April 1, 1981. In the interim, the defendant gave two inculpatory statements, the first of which, on March 30, 1981, was transcribed, and the second of which, on March 31, 1981, was tape recorded. The later statement contained a slightly different version of the offense than the earlier statement. It is only the second, tape recorded statement which the defendant contends should have been suppressed, because the first statement was never introduced into evidence at the defendant's trial.

After the defendant's arrest, he was taken to the Washington Park police station, where he was detained overnight. On March 30, he was transported to the St. Clair County jail at approximately 9 a.m. He participated in several lineups and was returned to the Washington Park facilities at 3 p.m. Later that afternoon, the defendant was interviewed at the Washington Park police station by Agents Thomas O'Connor and Jimmy Bivens of the Illinois Department of Law Enforcement. O'Connor and Bivens testified that the defendant was given *Miranda* warnings before he gave the statement, and no threats or promises were made to him. Both agents stated that during the interview, the defendant seemed cooperative, alert and coherent. This testimony was corroborated by Washington Park police sergeant Phillip Delaney, who was present during that questioning.

Following the interview, the defendant indicated that he would accompany the officers to the house of his aunt, Helen Phillips Shanklin, to recover several items which had been used in the robbery during which the murder was committed. At approximately 8 p.m., the defendant, accompanied by O'Conner, Bivens, Sergeant Delaney and Agent Terrence Delaney of the Illinois Department of Law Enforcement, arrived at the house of the defendant's aunt. Ms. Shanklin executed a consent to search form, and the officers recovered a .22-caliber weapon and army fatigues from the basement. Before the defendant was taken back to the Washington Park police department, his aunt gave him a beverage, which the officers thought was a soft drink. The officers and the defendant remained at the Shanklin residence for nearly 30 minutes.

While at the Shanklin house, the defendant showed no signs of illness or other disturbance. However, at about 10:30 p.m. or 11 p.m., at the Washington Park police department, the defendant appeared to be in "somewhat of a stupor." To the officers, he seemed incoherent, slurred his speech, and had difficulty standing and walking. The

defendant was transported by ambulance to St. Mary's Hospital in East St. Louis, where he was admitted shortly after midnight. He was given an agent to induce vomiting and was kept in the hospital overnight. The defendant was discharged at 9:15 the following morning and was returned to Washington Park by Patrolman Frank Franklin. According to Franklin, the defendant appeared and acted coherent and even refused to use a wheelchair which was offered him upon his discharge.

Shortly after the defendant arrived at the Washington Park police department, he was transferred to the Fairview Heights facilities of the Department of Law Enforcement by Agents Bivens and O'Connor. At about noon, the defendant gave a statement which was tape recorded by O'Connor, and which would have been videotaped by State Trooper James Gallo, but the equipment did not function. Both O'Connor and Bivens testified that prior to giving the statement, the defendant was given *Miranda* warnings. They recalled that he seemed coherent throughout the interview, that no threats or promises were made to him and that he told them that he was not under the influence of drugs or alcohol.

The defendant testified that in the afternoon of March 30, at the Washington Park police department, Agent O'Connor pushed his head against a concrete wall, following which, the defendant stated, he did not remember anything, including the first statement, until he was discharged from the hospital. According to the defendant, Agent O'Connor told him at Fairview Heights that if he did not give a statement, "what happened to him last night could be permanent." O'Connor denied striking the defendant, and Agent Bivens testified that he did not observe any physical contact between the defendant and O'Connor. The defendant claimed to have developed a knot on the back of his head from the blow, but on cross-examination, he admitted that he did not tell the doctors at St. Mary's Hospital that he was hit on the head. He did state that he told the nurses at the St. Clair County jail about the incident.

The defendant does not argue that his confession was involuntary, but instead, he insists that his detention for three days before being charged with an offense violated his constitutional (*Gerstein v. Pugh* (1975), 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854) and statutory (Ill. Rev. Stat. 1981, ch. 38, par. 109—1) rights to prompt presentment to a judicial officer for a determination of the probable cause for detention. He notes that where an individual is arrested without probable cause, a confession which is the product of that illegal arrest is not admissible solely because it is voluntary for purposes of the fifth

amendment. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254; *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) In such circumstances, the fourth amendment, as applied to the States through the fourteenth amendment, requires the State to show that the confession was "sufficiently an act of free will to purge the primary taint" of the illegal arrest. *Wong Sun v. United States* (1963), 371 U.S. 471, 486, 9 L. Ed. 2d 441, 454, 83 S. Ct. 407, 416-17.

The United States Supreme Court has mandated use of this stringent test to determine the admissibility of a confession obtained after an arrest (*Brown v. Illinois; Dunaway v. New York*) or search and seizure (*Wong Sun v. United States*) made in violation of the fourth amendment. The defendant asserts that this standard should also be applied to a confession allegedly obtained in violation of the fourth amendment's prompt presentment requirement as enunciated in *Gerstein v. Pugh*. Initially, we question the defendant's preservation of this fourth amendment argument for purposes of this appeal, because the delay in presenting the defendant to a magistrate was not specified as a ground for suppression in the suppression motion, at the hearing on the motion, or in the post-trial motion. A specific objection to the admission of evidence waives all grounds not specified (*People v. Curry* (1973), 56 Ill. 2d 162, 306 N.E.2d 292), and even a constitutional question not properly presented at trial will not normally be considered on appeal. (*People v. Amerman* (1971), 50 Ill. 2d 196, 279 N.E.2d 353.) Nonetheless, even upon consideration of the defendant's fourth amendment claim, we find it to be meritless.

While the Federal courts have used a higher standard of proof to admit a confession obtained following a violation of a Federal statutory right to prompt presentment (*Mallory v. United States* (1957), 354 U.S. 449, 1 L. Ed. 2d 1479, 77 S. Ct. 1356; *McNabb v. United States* (1943), 318 U.S. 332, 87 L. Ed. 819, 63 S. Ct. 608), this rule has not been applied to the States through the fourteenth amendment (see *Culombe v. Connecticut* (1961), 367 U.S. 568, 6 L. Ed. 2d 1037, 81 S. Ct. 1860; Annot., 19 A.L.R.2d 1331 (1951)), and the defendant does not suggest otherwise. In Illinois, the reported decisions uphold the principle that violation of the constitutional or statutory right to a prompt determination of probable cause for detention does not require exclusion of a confession obtained during that detention, but is instead a factor to be considered in determining whether the confession was voluntary. (*People v. Lucas* (1980), 88 Ill. App. 3d 942, 948-49, 410 N.E.2d 1040, 1044-45; *People v. Dees* (1981), 85 Ill. 2d 233, 237-38, 422 N.E.2d 616, 618 (*dicta*); see also *People v. Walker* (1977),

45 Ill. App. 3d 627, 360 N.E.2d 64.) The confession will be excluded only if it is involuntary.

■■ The defendant characterizes these Illinois authorities as representing "a pre-*Gerstein* and a pre-*Brown v. Illinois* viewpoint," and urges this court to adopt a different position. However, *People v. Lucas* and *People v. Dees* explicitly considered the *Gerstein* decision, especially the statement that "a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause." (*Gerstein v. Pugh* (1974), 420 U.S. 103, 119, 43 L. Ed. 2d 54, 68, 95 S. Ct. 854, 866.) We find nothing in *Gerstein, Brown* or *Dunaway* to cast doubt on the statements in the Illinois cases that a confession obtained during detention in violation of constitutional or statutory prompt presentment requirements will not be suppressed unless involuntary. Absent expansion of the *McNabb-Mallory* rule to the States or specific adoption of such a position in Illinois, we continue to adhere to the principles expressed in *Lucas* and *Dees*.

In the case at bar, the defendant does not present his tape-recorded statement as involuntary, nor do we believe that such a claim could be made. Prior to giving that confession, the defendant was given *Miranda* warnings. The defendant stated that he was not under the influence of drugs or alcohol that morning, and appeared to be coherent at that time, according to the police personnel who were involved with the making of the statement and the two transfers of the defendant before the statement was given. Moreover, although the defendant claimed that the statement was coerced by a threat from Agent O'Connor, this testimony is significantly undermined by the testimony of Agents O'Connor and Bivens that O'Connor did not strike the defendant and that they did not make any threats or promises to him, in addition to the failure of the defendant to complain to hospital personnel about a blow to his head. The evidence introduced at the suppression hearing thus shows that the tape-recorded statement was voluntary, and the trial court properly admitted it into evidence at the defendant's trial.

The defendant's final assignment of error concerns certain testimony admitted in aggravation at his sentencing hearing. At that hearing, Ernest Mosby testified that on March 26, 1981, the defendant told him that, the previous evening, he had shot someone during a robbery of a Sunoco service station in East St. Louis. Additional evidence in aggravation showed that at approximately 8 p.m. on March 25, 1981, a man named Charlie Dones, an attendant at the Sunoco station at 7701 State Street in East St. Louis, was found dead at that

station. He had been shot twice. A spent slug was taken from the body of Dones and was analyzed at the Fairview Heights crime laboratory of the Illinois Department of Law Enforcement. Laboratory director Larry Lorsbach testified that, in his opinion, that slug was fired from a .38-caliber Smith and Wesson revolver which had been recovered from the floor of the defendant's car, near the gas pedal, by Washington Park police after the defendant's arrest.

It is not disputed by the defendant that testimony concerning an offense for which he had not been prosecuted or convicted is generally admissible in aggravation. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.) However, he observes that, in pronouncing this rule, our supreme court stated, "More important are the questions of relevancy and accuracy of the information submitted." (*People v. La Pointe* (1981), 88 Ill. 2d 482, 498, 431 N.E.2d 344, 351.) In this case, he argues that the State's evidence in aggravation linking him to the Sunoco homicide was insufficiently trustworthy to have been relied upon by the sentencing court.

The defendant contends that Mosby's credibility is significantly impeached by his criminal record. At the sentencing hearing, Mosby testified that he had been involved with the defendant in armed robberies at a Wiggs service station in East St. Louis and at a liquor store in Sauget. He also admitted that he had been put on juvenile probation. Although Mosby was charged with both armed robberies, he received a minimum sentence of six years' imprisonment for the liquor store robbery, and the charge based on the service station robbery was dismissed, pursuant to plea negotiations. Also pursuant to plea negotiations, the State's Attorney agreed to recommend that Mosby's sentence be served at a penal institution other than the Menard penitentiary, because, as Mosby stated, he felt that his life would be in danger at Menard. According to the defendant, the results of the plea negotiations establish Mosby's indebtedness to the State and give him a motive not to testify truthfully.

In addition to these weaknesses in Mosby's credibility, the defendant points out certain alleged inconsistencies in his testimony. Responding to the prosecutor's question, Mosby stated that on March 26, the defendant came to Mosby's house "by himself" and admitted to the killing. The defendant asserts that this testimony is inconsistent with Mosby's answers on cross-examination, where he said that his girlfriend and Earlie Glenn were present when Mosby was told about the shooting, and that he was at his girlfriend's house. However, it should be noted that the fact that the defendant arrived at Mosby's house, or his girlfriend's house, alone, is not inconsistent

with the testimony that Mosby's girlfriend and Earlie Glenn were there when the defendant talked to Mosby.

According to the defendant, the testimony concerning the Sunoco homicide was relied upon by the court in imposing the maximum non-extended sentence upon him. At the conclusion of the sentencing hearing, the court said of that testimony, "The court has, obviously, heard the evidence that was presented by the State in aggravation, although, obviously, that does not amount to a conviction. It wasn't a matter of proving something beyond a reasonable doubt. And there was no jury to determine your guilt or innocence. It, at the very least, corroborated the fact which is abundantly clear on the record, Mr. Goree, that you are a killer." Because the evidence introduced at trial did not show that the defendant killed James Milliner, he asserts that the evidence pertaining to the Sunoco shooting influenced the court in making its sentencing decision, and was prejudicial error.

■ We cannot agree with the defendant's argument. While Mosby's prior criminality adversely affects his credibility, it should be recalled that his testimony, like that accepted in *La Pointe*, was sworn testimony, presented in open court, and was extensively cross-examined. Its weaknesses were thoroughly presented to the trial court. Mosby's version of the Sunoco killing, as having occurred on the evening of March 25, was corroborated by police witnesses, whose testimony is not challenged by the defendant. Moreover, the weapon which fired the slug recovered from the body of Charlie Dones was found in the defendant's car when he was arrested. The defendant argues that this fact is inconclusive in tying the killing to him, because Mosby and Earlie Glenn were also in that car when they were stopped. But, this ignores the evidence that the defendant was driving the car at that time, and the weapon was found near the accelerator pedal. Finally, as we have discussed above, the alleged inconsistencies between Mosby's testimony on direct examination and his answers on cross-examination are either nonexistent or not so significant as to render that testimony untrustworthy for consideration in aggravation. The evidence concerning the defendant's role in the Sunoco homicide was sufficiently reliable under the standards of *La Pointe* to be used by the sentencing court in its decision.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

HARRISON, P.J., and KASSERMAN, J., concur.