The appellant, Nelson Hammond, was indicted in a two-count indictment for the offenses of felony murder and of robbery in the first degree, as proscribed by § 13A-6-2 (a)(3) and §13A-8-41, Code of Alabama 1975, respectively. A jury found Hammond guilty of first degree robbery and he was consequently sentenced to imprisonment for a term of twenty years. *Page 559 
The prosecution's evidence, in the light more favorable to the prosecution, tended to establish the following facts:
On November 20, 1982, at approximately 6:30 p.m., Hammond entered Joseph Alfano's grocery store and bought cigarettes. Alfano knew Hammond because Hammond had been coming into his store frequently for the past ten or fifteen years. At approximately 7:00 p.m., Alfano closed his store and walked toward his truck with his thirteen-year-old son, Chris, and his employees, Odell Hudson and John Williams. Chris unlocked the driver's door to his father's truck, which was parked in front of the store, put the keys in the ignition, and sat on the passenger's side. While Hudson and Williams walked along the passenger's side of the truck to put groceries in the truck and while or after Alfano got into his truck, a robber wearing a green and blue ski mask and holding a sawed-off shotgun ordered Alfano to lie down on the ground. Alfano complied. While Alfano was lying on the ground, the masked man took from Alfano a .45 automatic pistol, which was loaded, and a wallet containing from $250 to $300. Although Alfano did not see another individual, two people repeatedly asked him, with obscenities, where the rest of the money was. Alfano finally answered that it was in the cigarette box in the truck. Alfano was of the opinion that these two voices were those of two black males.
Sometime during the robbery, this second robber, who was wearing a blue and red mask, bent over into the truck through the driver's door, pointed a pistol at Chris, and asked if Chris had any money. After Chris answered, "No," the second robber quickly looked around the interior of the truck and then left and Chris crouched down. Then, two shots were fired; Alfano was shot in the left arm and the robber wearing the green and navy ski mask was killed by a shot from a .45 caliber pistol. According to Alfano, he was shot first; then he hollered to his son; and then a second shot was fired. Chris did not see who fired these shots, but he did rise up in time to see a masked man run away. Neither did Alfano see who shot him or the robber, but after the shots, he also saw a masked man fleeing toward the railroad tracks. He looked beside him and saw his keys and a man lying on the ground. A double-barrel 12-gauge sawed-off shotgun containing two live rounds was lying over the robber's right arm. In his right front pants pocket were two more 12-gauge shells. The dead man was later identified as Johnny Earl White (subsequently referred to herein as Earl). Earl had also been a customer at the grocery, but Alfano did not think he had been in the store on that particular day.
Earl resided three and a half blocks from the grocery with, among others, his mother and his brothers, Stanley and Owen. Stanley testified at trial that, between 4:30 p.m. and 5:00 p.m. on the day of the robbery, he saw Aaron Turner and Hammond talking with his brother Earl out in the yard of the White residence. He further stated that, as he was walking by the group, he overheard Earl tell Turner that he wanted Turner to return his shotgun, that he was going to rob someone. Turner replied that he could get his shotgun. In addition, Stanley testified that the three men stayed for ten to fifteen minutes and then left in Hammond's car. Stanley saw Earl again around 6:15 p.m. He was alone and not carrying a shotgun. Owen corroborated Stanley's testimony that Earl and Hammond were in the yard at the White residence at approximately 4:30 or 5:00 p.m. Owen also testified that he first saw the two together that morning.
Turner testified that, at approximately 6:00 p.m., Hammond and Earl came to his mother's house to get Earl's shotgun, but the weapon was at his house, so the three went in a car driven by Hammond to Turner's house. Turner further explained that the three went inside, Turner gave Earl the shotgun, and Earl and Turner drank some whiskey. He also stated that during the ten-to fifteen-minute visit, in Hammond's presence, Earl told him that "he needed some money and he had to go get him some money" and that "he missed Alfano or *Page 560 
something the night before and he was going to rob him." He identified the shotgun found on Earl's body as that belonging to Earl.
Hammond was arrested at 10:58 p.m. on the same evening of the robbery of Alfano and the killing of Earl. Sergeant Ballard, a homicide detective with the Birmingham Police Department, interviewed Hammond at City Hall after he was advised of hisMiranda rights, waived them, and signed a standard waiver form. In his statement, given at 11:56 p.m., Hammond stated that, at approximately 5:00 or 5:30 p.m., he went to Avondale for ten to fifteen minutes; that he got home at 6:00 or 6:30 and let Earl out; that after helping his mother, he drove in his car to a game room (located on the same side of the street as the grocery, but separated by railroad tracks) and spent a dollar playing a video game called "Pac-Man"; that he then went to Alfano's and bought some cigarettes and potato chips; and that he then crossed the street and stood on the corner, where he saw "two dudes" come around the corner, heard Alfano holler, and saw Alfano's employees run. Hammond further stated that he then left in his car, arrived at his girl friend's house at 7:03, and stayed there until 10:00 or 10:30 p.m.
Two days later, November 22, Hammond gave a second statement at 4:21 p.m. while in the city jail. Again, he waived hisMiranda rights, after being advised of them, and he signed a waiver form. During this second interview, Hammond extended his first statement by giving the following version of events: He met Earl at a crap game; he took Earl to Avondale at Earl's request and then to Turner's mother's house, where Turner joined them; then the three went to Turner's house, where Turner and Earl went inside. He left there sometime between 6:00 and 6:30, went home and helped his mother, and then went to the game room and then to Alfano's grocery. From there, he went across the street and while he was smoking, he saw Alfano and his son; he saw the younger Alfano get into the truck; and then he saw two men, one wearing a long black coat and the other wearing a light-colored jacket, come from around the building. He left in his car after he heard Alfano holler and saw the employees run away. Hammond further added that, after he and Earl took Turner somewhere after the three had left Turner's house, he picked up a man named Tatum Madison; he left Madison and Earl beside the grocery store; and, then, he parked his car across from the store and went to the game room.
Although Hammond was incarcerated on November 20 at approximately 11:00 p.m., an arrest warrant was not obtained until November 23. The Birmingham police were restricted by a policy which required that a warrant be secured within seventy-two hours of the accused's arrest. Although Hammond was incarcerated for roughly sixty-six hours, without the issuance of a warrant, according to Sergeant Ballard, Hammond never asked how long he was going to be at the city jail, with what was he charged, or whether he could be released on bond.
After a warrant was secured and after Sergeant Ballard interviewed Madison, Hammond gave a final statement at 5:58 p.m. at the city jail. This interview was conducted on the advice of the District Attorney's office. This statement was given after Hammond was advised of and had waived his Miranda
rights a third time, as evidenced by his signature on a waiver form. In this statement, which was recorded on tape, Hammond stated the following: On November 19, Earl approached him on the porch at the game room and asked him if he wanted to make some money. Then Earl called Madison over and said that since it was raining, it would be a good night to "get" Alfano, which Hammond took to mean rob Alfano. After Hammond responded to Earl that he "couldn't handle it," he went into the game room and Madison and Earl left. When he saw Earl at a crap game the following day, Earl offered him five dollars to take him to Avondale, so Hammond took him. They went to someone's house, but the person Earl wanted to see was not there, so they waited. When *Page 561 
the man arrived, Earl went with him into a back room while Hammond stayed in the living room. When Earl and Hammond left, neither had anything in his hands. During this time with Earl, no plan of the robbery were discussed. After they returned from Avondale, they went to Turner's mother's house and Earl got Turner, while Hammond remained in his car. Then, the trio went to Turner's house so that Turner could give Earl a shotgun, and while they were smoking "a couple of joints," Turner brought a shotgun from the back room. Then, Earl and Hammond left and went to Madison's house, where an agreement was reached by Hammond, Earl, and Madison. In accordance with the agreement, Hammond was to meet Madison and Earl in an alley two blocks from Alfano's store after the store closed; Madison and Earl were going to run there after the robbery and Hammond was to take them back to Madison's house. Hammond then took them to Alfano's grocery. Madison told Hammond that he did not have a gun and Hammond did not have a weapon; only Earl was armed. Earl and Madison had green toboggan masks in their pockets. When Hammond dropped them off at the back of the store, Hammond told them, "I can't go through with this man cause I just ain't got the nerves for it." So Hammond drove his car across the street, parked it, and went into the game room. When he realized that the store was about to close, he went over there and bought cigarettes and potato chips. He did not see either Madison or Earl. Then he went across the street and, while he was smoking "a joint," he saw Madison and Earl come from the side of the grocery. After he saw Earl grab Alfano and heard Alfano yell, Hammond ran to his car. As he was driving away, he heard a shot. He then went to his girl friend's house, picked her up, and went to his house.
When asked who shot Earl, Hammond answered, "[W]hen I heard the shots as I was driving off, I thought they had shot [Alfano] but then I heard you know, like rumors come out so fast you know, they said some dude off the street shot Earl, they said [Alfano's] son shot Earl, I don't know." This third statement ended at 6:22 p.m.
In addition to the above evidence, the State also endeavored to establish Hammond's guilt by attempting to show that the second robber who confronted the younger Alfano was taller than Earl. The evidence established that Hammond's height is six feet, one inch; Madison's height is five feet, six inches; and Earl's height was five feet, eleven inches. During his testimony, Chris expressed the opinion that the robber who fled from the scene was taller than the robber who was killed.
In his own behalf, Hammond testified to the following sequence of events: When he saw Earl and Madison at the game room on November 19, he heard Earl say he wanted to "get" Alfano and make some money. Hammond told Earl he could not handle it. On November 20, he took Earl to Avondale and they saw Madison on the way. After leaving Avondale, Earl wanted to go to Turner's house. They picked up the gun from Turner and went to Madison's house for ten or fifteen minutes. Then, Hammond, on his way to the game room, let Earl and Madison out at their request, in a church parking lot. Hammond did not know where they were going; he simply wanted them out of his car. After he parked, Hammond went to the game room for twenty to thirty minutes; went to Alfano's grocery at approximately 6:30 p.m.; and then went across the street, where, as he was smoking "a joint," he saw two masked men approach Alfano. Hammond left and, after picking up his girl friend (at approximately 7:15, according to other defense witnesses), he went to his mother's house.
Hammond further testified that he did not know for a fact that there was going to be a robbery; that he did not make an agreement to rob the grocery or be the getaway driver; and that he, in fact, did neither of these things.
 I
Hammond was charged by a two-count indictment, Count One charging felony-murder *Page 562 
of his robbery cohort, Earl White, and Count Two charging robbery of Alfano. Hammond contends that the jury's acquittal under Count One undermines and fatally conflicts with the conviction on Count Two; he argues that, since the verdict of acquittal implies that the jury found that he was not White's murderer, the jury could not have consistently found, in fact and in law, that he was Alfano's robber.
For authority, Hammond relies on Ashe v. Swenson,397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), which stands for the proposition that the Fifth Amendment guarantee against double jeopardy includes the doctrine of collateral estoppel. This collateral estoppel principle "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Id. at 443, 90 S.Ct. at 1194.
In United States v. Powell, 469 U.S. 57, 105 S.Ct. 471,83 L.Ed.2d 461 (1984), wherein the United States Supreme Court reasserts the well established principle that inconsistent verdicts are permissible in federal courts, the respondent argued that the principles of res judicata or collateral estoppel should apply to verdicts rendered by a single jury, to nullify a guilty verdict rendered on a compound offense where the jury acquits the defendant of the predicate offense. Id. at 63, 105 S.Ct. at 476. The respondent was urging the Court to carve out an exception to the general rule enunciated in Dunnv. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356
(1932), that a defendant convicted by a jury on one count cannot attack that conviction on the ground that it is inconsistent with the jury's verdict of acquittal on another count.
In rejecting the respondent's argument for an exception to the Dunn rule, the Court noted Dunn's progeny and observed that "this is not a case where a once-established principle has gradually been eroded by subsequent opinions of this Court."469 U.S. at 63, 105 S.Ct. at 476. In further proclaiming the soundness of the Dunn rule and disregarding the respondent's argument, the Powell Court stated:
 "As the Dunn Court noted, where truly inconsistent verdicts have been reached, `[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.' Dunn, supra, 284 U.S., at 393, 52 S.Ct., at 190. The rule that the defendant may not upset such a verdict embodies a prudent acknowledgement of a number of factors. First, as the above quote suggests, inconsistent verdicts — even verdicts that acquit on a predicate offense while convicting on the compound offense — should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense. But in such situations the Government has no recourse if it wishes to correct the jury's error; the Government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause. [Cites omitted.]
 "Inconsistent verdicts therefore present a situation where `error,' in the sense that the jury has not followed the court's instructions most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course. Harris v. Rivera, [454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981)], indicates that nothing in the Constitution would require such a protection, and we therefore address the problem only under our supervisory powers over the federal criminal process. For us, the possibility that the *Page 563 
inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest. This possibility is a premise of Dunn's alternative rationale — that such inconsistencies often are a product of jury lenity. . . .
 ". . . The fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable.
 "We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake. . . . [W]ith few exceptions, . . . once the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment. Courts have always resisted inquiring into a jury's thought processes . . . through this deference the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality.
 "Finally, we note that a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts."
469 U.S. at 64-67, 105 S.Ct. at 477-78 (footnote omitted).
In commenting further on the respondent's argument that the acquittal on the predicate offense should collaterally estop the Government on the compound offense, the Court stated that "the argument necessarily assumes that the acquittal on the predicate offense was proper — the one the jury `really meant.'" Id. at 68, 105 S.Ct. at 478. However, as the Court recognized, this is not necessarily correct. The Court further noted:
 "The problem is that the same jury reached inconsistent results; once that is established principles of collateral estoppel — which are predicated on the assumption that the jury acted rationally and found certain facts in reaching its verdict — are no longer useful."
Id. at 68, 105 S.Ct. at 479.
In conclusion, the Court recognized that the respondent "is given the benefit of her acquittal on the counts on which she was acquitted, and it is neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted." Id. at 69, 105 S.Ct. at 479.
We adopt this approach formulated in Dunn and the cases which followed it and we find that "the best course to take is simply to insulate jury verdicts from review on this ground." Id. at 69, 105 S.Ct. at 479 (footnote omitted). This conclusion follows the recent opinion in McClellan v. State,484 So.2d 1150 (Ala.Cr.App. 1985). There, the court recognized the conflict of views on the treatment of the inconsistent verdicts rendered on several counts and chose to adopt the majority view, which follows the holding of Dunn. See also W. LaFave 
J. Israel, Criminal Procedure § 23.7 (e) (1984) (recognizing that most state courts follow the approach taken by the Supreme Court).
As Dunn "stressed the unreviewable power of a jury to return a verdict of not guilty for impermissible reasons," Harris v.Rivera, 454 U.S. at 346, 102 S.Ct. at 464, so have the Alabama appellate courts. See, e.g., Bradham v. State, 27 Ala. App. 225,170 So. 222, cert. denied, 233 Ala. 106, 170 So. 223 (1936) (wherein the court recognized that, although the same evidence amply supported a guilty verdict on both counts of the indictment, it was within the province of the jury to find the defendant guilty on only one count). The record contains ample evidence of Hammond's guilt for the robbery offense and the record further reflects that this verdict is the *Page 564 
product of a fair trial. Accordingly, we find that the verdicts, even if inconsistent, should stand as rendered.[1]
 II
Hammond contends that the trial court's refusal to suppress his three statements was erroneous, because (a) they are the product of his illegal warrantless arrest, which was based on insufficient probable cause, and (b) they are the product of his illegal detention, which resulted from an undue delay in taking him before a judicial officer for a probable cause determination.
 A
In Alabama, a law enforcement officer is authorized to make a warrantless arrest when a felony has been committed and he has reasonable cause to believe that the person arrested committed it. Ala. Code 1975, § 15-10-3 (3). This requirement of reasonable cause has been equated with probable cause. Meeks v.State, 434 So.2d 844, 846 (Ala. 1983). The question of probable cause must be determined by an examination of the circumstances surrounding the arrest. Nance v. State, 424 So.2d 1358, 1362
(Ala.Cr.App. 1982). "[T]he sufficiency of the knowledge of the officers must be determined, not by analysis of the effect of each known circumstance in isolation, but by a conclusion as to what a reasonable man, knowing all the facts which the officers knew from their investigation, would have believed under these circumstances." Moore v. State, 415 So.2d 1210, 1216
(Ala.Cr.App.), cert. denied, 459 U.S. 1041 (1982) (quotingState v. Knapp, 294 So.2d 338, 341 (Fla.Dist.Ct.App.), cert.denied, 302 So.2d 415 (Fla. 1974)).
Our review of the evidence convinces us that probable cause existed for Hammond's arrest. Sergeant Ballard's voir dire testimony reveals the following: Prior to Hammond's arrest, Sergeant Ballard talked with Stanley and Owen White, brothers of the murder victim. Both told her that Hammond was with Earl immediately before the robbery. In addition, Stanley stated that, approximately one and a half hours before he learned of his brother's death, "he had seen his brother [Earl], . . . with Nelson Hammond, black male, [at which time Earl] said, `We are going to get some money, just be cool.'" He also informed Sergeant Ballard that Hammond and Earl were talking about committing a robbery. In addition to the above, the officer also testified that Hammond "fit the description." This evidence reveals sufficient knowledge in possession of the officers to support a reasonable man's conclusion that Hammond committed the robbery. Accordingly, Hammond's arrest was legal.
 B
At the suppression hearing, the following facts about Hammond's detention were elicited: Hammond was arrested without a warrant at 10:58 p.m. on November 20. He was put in the city jail and held on a "jail charge," charging him with the offenses of murder and robbery. At 11:56 p.m., Hammond gave his first statement. Sergeant Ballard did not work on the following day. On November 22, at 4:21 p.m., Hammond gave a second statement. After a warrant was obtained for his arrest on November 23, Hammond gave a final statement at 5:47 p.m.
During her voir dire testimony, Sergeant Ballard explained that she always tries to get the warrant as soon as possible even though the office's policy allows detention of an accused up to seventy-two hours after the initial arrest. She further noted that Hammond was held without a warrant for sixty-six hours; but that during this period, Hammond never requested an attorney, never asked how long he was going to be held or when he was going to be released, and never asked to see any member of his family. Sergeant Ballard also stated *Page 565 
that she did not recall him asking about bond.
For the foundation of his argument calling for the suppression of his statements because of the three-day delay in presenting him to a judicial officer for a probable cause determination Hammond cites Gerstein v. Pugh, 420 U.S. 103,95 S.Ct. 854, 43 L.Ed.2d 54 (1975), for its holding that, following a warrantless arrest, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." Id. at 114,95 S.Ct. 863. Hammond urges this court to create a per se rule of exclusion mandating the suppression of any evidence gained from a violation of this particular Fourth Amendment right. We find the following explanation of Gerstein and its ramifications sufficient to dispose of Hammond's argument:
 "In Gerstein v. Pugh, 420 U.S. 103 [95 S.Ct. 854, 43 L.Ed.2d 54] (1975), the Supreme Court ruled that persons in police custody, arrested without warrant and awaiting trial, are entitled under the Fourth Amendment to a judicial determination of probable cause. The Court refused, however, to elevate this determination to the status of a preliminary hearing complete with due process procedural safeguards such as the right to testify in one's own behalf, the right to confront and cross-examine witnesses, and the right to be represented by counsel. . . .
". . .
 "The Gerstein opinion did not indicate when the judicial determination of probable cause must be held; state practices vary.
". . .
 "Many states have rules similar to the federal McNabb-Mallory rule embodied in Federal Rule of Criminal Procedure 5 (a), mandating that the failure to bring a suspect before a magistrate within a `reasonable time' after detention requires suppression of incriminating statements made during the period of unreasonable delay. The Oregon Supreme Court in State v. Mendacino [288 Or. 231] 603 P.2d 1376 (Ore. 1979), held that unconstitutional delay in holding a probable cause determination does not automatically trigger exclusion of a confession obtained during the period of delay. However, the court stated that `delay in arraignment is an important factor in determining whether a confession was voluntarily given.' Most courts agree that delay is to be treated in the manner prescribed in Mendacino."
W. Ringel, Searches Seizures, Arrests and Confessions § 23.6 (d) (1985) (footnotes omitted). See, e.g., People v. Goree,115 Ill. App.3d 157, 70 Ill.Dec. 869, 450 N.E.2d 342 (1983) (wherein the court ruled that the violation of the appellant's Gerstein
constitutional right to prompt judicial determination of probable cause for detention does not require per se exclusion of a confession obtained during the detention, but is instead a factor to be considered in determining whether the confession was voluntary).
Because Hammond has not pointed out, nor have we discovered, any remedial measure mandated by the United States Supreme Court or by Alabama's appellate courts[2] for a violation of the Fourth Amendment right expounded in Gerstein, see People v.Lucas, 88 Ill. App.3d 942, 43 Ill.Dec. 907, 410 N.E.2d 1040
(1980), we follow the majority view and hold that a delay in presenting one arrested without a warrant to a judge for a probable cause hearing is one circumstance to be considered in determining the voluntariness of a statement given during the delay. Compare Smith v. State, 291 Ala. 507, 509,282 So.2d 907, 909 (1973) (wherein the court *Page 566 
recognized that a confession which was made after arrest, but before presentment to a magistrate, as required by Title 15, § 160, Code of Alabama 1940, Recompiled 1958, is not automatically excluded; rather whether an accused was taken before a magistrate is a relevant factor for the jury to consider in determining the voluntariness of a confession).
Thus, we look to the totality of the circumstances surrounding Hammond's statements — one of which is the delay — to determine whether the evidence sustains the trial court's findings that all of Hammond's statements were made voluntarily. The record reveals no evidence of promises, threats, improper inducements, lengthy interrogations, or coercion. Rather, the record shows that, on three occasions, immediately prior to each interview, Hammond was informed of his Miranda rights and, each time, he signed a waiver confirming his understanding and waiver of those rights. We find nothing in the circumstances which would be sufficient to overcome his free will. While we find the length of delay to be troublesome and we gratuitously caution the State that its procedure is highly suspect, we are convinced that, on this record, there is no evidence that the single factor of delay affected the validity of Hammond's statements. Thus, the record sustains the trial court's findings of voluntariness. Accordingly, we reject Hammond's contention.
 III
Hammond was sentenced to twenty years' imprisonment in accordance with § 13A-5-6 (a)(4), which provides for enhancement of punishment as follows: "For a Class A felony in which a firearm or deadly weapon was used or attempted to be used in the commission of the felony, not less than 20 years." Hammond contends that his sentence was illegal because "the Alabama Code provision should not be applied to one whose participation in the offense was not established to have involved a weapon."
Because Hammond failed to present this issue to the trial court, the issue is not preserved for our review. Nevertheless, even if Hammond was actually unarmed, we find his contention to be without merit. By virtue of the jury's verdict, which encompasses its finding that Hammond was armed with a deadly weapon, the trial court had no alternative but to sentence Hammond in accordance with § 13A-5-6 (a)(4). Holloway v. State,477 So.2d 487 (Ala.Cr.App. 1985). This holds true regardless of whether the jury based its verdict on complicity, embraced in §13A-2-23 (2). "It is well established that a person present, aiding and abetting another in the commission of [a crime], is guilty as a principal and punishable equally with the perpetrator of the crime." Biggs v. State, 331 So.2d 763, 764
(Ala.Cr.App.) cert. denied, 331 So.2d 765 (Ala.Cr.App. 1976) (emphasis added).
Furthermore, if we accepted Hammond's contention, we would be giving the trial court discretion exceeding that conferred by the statute. In Mitchell v. State, 450 So.2d 181 (Ala.Cr.App. 1984), the court, in rejecting the argument that the trial court should be able to consider any mitigating circumstances, observed that the language of § 13A-5-6 (a)(4) is clear and its meaning is plain. See also Rocker v. State, 443 So.2d 1316
(Ala.Cr.App. 1983). In the instant case, we likewise reject the contention that the trial court should be able to consider as a mitigating circumstance Hammond's degree of participation in the offense; the statute simply does not differentiate between principals and accessories. For an example of a statute which limits imposition of a mandatory minimum sentence for possession of a firearm during commission of robbery to the defendant having actual, not vicarious, possession of the firearm, see Fla.Stat. § 775.087 (1976).
Having found Hammond's contentions to be without merit, the judgment of conviction is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] For purposes of our treatment of this issue, we have assumed that the verdicts are inconsistent. However, by our adherence to the view of the United States Supreme Court, we are not inclined to determine whether the two verdicts can be reconciled. Thus, our progression to the merits is no indication that we find the verdicts to be inconsistent.
[2] We have found only one Alabama case treating the issue of whether the appellant's confession was inadmissible because of a violation of his Gerstein Fourth Amendment right — Deloachv. State, 356 So.2d 222 (Ala.Cr.App. 1977), cert. denied,356 So.2d 230 (Ala. 1978). However, this particular case provides no explicit authority for the narrow issue before us, for there, the appellant argued that a Gerstein violation occurred because he was held without a probable cause hearing. The court disposed of this issue by finding that he was, in fact, given a hearing in compliance with Gerstein the day following his arrest, and, implicitly, that the confession was admissible. *Page 567